Our fourth case for this morning is United States v. Robert Dekelaita. Mr. Nash. Good morning judges. I'm Michael Nash for the defendant Robert Dekelaita. The defendant here stands convicted of a conspiracy that the government says began in the year 2000 and stretched to 2011. There are two problems the government has. One, there was no proof of a single overarching conspiracy. And second, there's a grave statute of limitations problem. As to the single conspiracy, the first thing that makes this case most unusual is that the government stated in the district court that there were multiple conspiracies. This is in their first Santiago proffer. And that as to the second Santiago proffer, they stated most of the clients who are the counsel, I'm, I'm mystified by why we would care about their Santiago proffers. The question is, what did they prove in the evidence to the jury? Well, I guess the judge found in the rule 29 in his rule 29 motion in ruling that the proof was sufficient to allow a reasonable juror to find that there was one conspiracy. That's what you need to discuss, not what was in Santiago proffers. I'll leave that alone then judge. The fact is that the, in the, in their second Santiago proffer, I guess I failed. No, I'm wrong judge. In after their proof, they're, they say in that motion, in that response, quote, sure. The clients likely were not full and knowing participants in the charged conspiracy. That's the government talking. Yeah. That was the district court's ruling to the district court ruled that a sensible jury could find a long running conspiracy between the defendant and other members of his office. Right. Two different interpreters, uh, another person, uh, and that some of that conspiracy took place within the five year statute of limitations. We even had cooperating witness who was involved in 2010. There were four, seven acts that the government says that bring it within the statute of limitations. Four are the applications for citizenship. The facts of the case specified and set out in our brief show that none of those four clients ever discussed citizenship with Mr. Deco light, that they employed other people to do it. And in fact, at least as to one of those clients, they told new and different lies, which the client said on the witness stand, the new lawyer told him to say, well, regarding an overt act within the limitations period, why aren't the actions on the JABO Cordova case regarding the affidavit and the meeting with, uh, associate attorney Alan Jacobs to prep for the immigration hearing enough. First of all, in that meeting, all that, all that Mr. Takish did with Mr. Uh, I'm sorry, it was your question about Jacob or Takish. The thing is JABO Cordova is cooperating by this time, but this is well within the statute, October 28. And we have other co-conspirators meeting with her, discussing the fraudulent asylum claim, discussing what's going on. Why isn't that enough just to nail this? Well, she can not be a co-conspirator. I'm not saying she is. I'm saying Jacob is and Takish. And we have, we have Mr. Deco light. She's not a co-conspirator. Mr. Takish testified. He certainly didn't testify that he did anything wrong. The government didn't suggest he did anything wrong. He's still a practicing lawyer. One would have to think that had the government believed truly that he committed a crime, they would have reported him and something would have happened. Why isn't this though, proof that Mr. Deco light is running this fraudulent scheme. Part of it gets nailed down within the statute of the first interpreter is out by 2003, but he gets replaced by the second interpreter. He's using interpreters three and a half years later. I understand that. And the other two, can I ask you if you're making a particular argument? So you focused a lot on whether the conspiracy as a whole was that there was at least proof of a conspiracy that began, I'll say around 2008 and extended through the time of the indictment. I didn't see you making a separate argument that evidence was introduced that couldn't have been used, that there was a 404 B problem, that there was any kind of other issue with the evidence of the earlier applicants that shouldn't have come in. You're not making a particular evidentiary argument, are you? I'm not making a 404 B because they didn't make an application to admit 404 B evidence. Well, I'm saying if it didn't, if the earlier applicants for asylum, fraudulent applicants for asylum, weren't part of the charged conspiracy, of course, a lot of I didn't see you making any argument that that was separately reversible error. Well, they didn't, they didn't rely on 404 B and most of that evidence. I understand that. I'm just saying maybe that evidence would have come in, maybe it wouldn't, but I didn't see in your brief any argument that even if there is one conspiracy proven, we need a new trial for this other reason. You didn't say that. I didn't say that. Okay. I don't think that you can draw from these facts that there was a single overriding conspiracy. The government talks about conspirators moving in and out. Well, he's the hub. That's what does make this a little different from a lot of hub and spokes. He's involved with everything, whether there's a rim around the spokes, may not drive this wheel metaphor into the ground. That's another thing, but he is involved with each of these people. No question. But all the hub and spoke conspiracies say that those people that form the spoke must know of each other when they're the ones being indicted, of course, because if they don't, if they don't know they're part of a conspiracy and it's not reasonably foreseeable to them, then you have a big problem. But for the hub, it's different. Well, then they're not conspirators. If they don't have a common design. We're back to the fact that the district court sustained this on the ground that the conspiracy was between the defendant and the other participants in his office, not between the defendant and the aliens. But the only two people in his office were the two lawyers that were involved in 2010 and 2011 in one event, and with regard to the affidavit, it was never used and all it said was that this fella knew when she came into the country and they put him on the stand, never asked him about the affidavit itself, never showed him the piece of paper, but say in their brief before this court that somebody forged his from 2000 to 2003 and the second interpreter in 2006 and 2009, I believe. Benjamin. Benjamin. So there's no continuity there. The government says he had over 2,000 to 3,000 of these applications and they choose these and try to make a long-running conspiracy. All the cases that they cite, the facts are very different. This case is precisely like Kodiakos, precisely like Bernard, and not like Huddle or Orlando or the other cases which the government cites. Those were short periods of time with fewer number of people and all of them, not all of them, but most of them knew each other one way or the other. This is very different from all those cases. If there are no questions, I'll... Okay, you can reserve the rest of your time. That's fine. Ms. Kostinik. May it please the court, Andrea Kostinik on behalf of the United States. The district court did not air... ...that the applications for citizenship were overt acts in the conspiracy. I've been trying to think about how that could be given that they were far removed in time and they didn't involve any of the conspirators. Did you produce evidence that the defendant informed the clients of their right to seek citizenship as opposed to their rights to seek permanent residency? And did they ever agree with the clients at any point to assist them in obtaining citizenship? The answer to that is no, but it's legally irrelevant. Conspiracy law, well-established in the circuit, requires only that those overt acts be foreseeable reasonably to the defendant and be in furtherance of the conspiracy. So asylum is not a permanent benefit. It can be revoked at any time, even if it's indefinite while those conditions exist in the country. Every single one of the defendant's clients that the jury heard about in this case who were granted asylum went the step further to apply either for legal permanent residency or and or citizenship. There wasn't a single one who was granted asylum in this case that did not do that. Exhibit 36A and 36B. But how did they ever, did these people ever agree to assist them in obtaining the citizenship? There are no conversations that the jury heard about that involved the defendant in which he discussed citizenship explicitly with these clients. However, asylum again is not permanent. The entire point of it is to allow somebody to stay in the United States permanently. Well, or you're saying as long as necessary, but the government's theory has to be that succeeding in obtaining asylum for someone gets gets the first brick in the wall built essentially and that that's that was the prerequisite toward more permanent rights to stay in the country, whether they're becoming a legal permanent resident, whether it's becoming a citizen. I think that's steps. That's a fair representation and that's reflected in the letters that the defendant did send to clients that advised them that after a year had passed between their asylum approval, from their asylum approval, that they could go forward and apply for legal permanent residency. The defendant did represent some clients in derivative applications for family members, which they were able to do after they had obtained some sort of permanent status. Salman Salman is an example of that, where the defendant was hired later to file an application on behalf of Mr. Salman's son. So there was continued representation in some of these cases. It's worth noting, as I think Judge Wood pointed out, that they're the overt acts in this case that fall within the statute of limitations are not limited to the citizenship applications. There are overt acts, including recordings that happened in 2010 and 2011 involving the cooperator, Ms. Jabu Cordova. Those were overt acts that included preparing her for an asylum hearing with the Associate Attorney Alan Jacob. It included the preparation and the mailing of a fraudulent affidavit for Jabu Cordova's reopened case. There's also the asylum interview that happened in were part of this broader conspiracy that involved not only the clients, but other participants that the defendant chose to help assist in this wide-ranging conspiracy. Now, if you had not had that evidence, I think I would be having much more trouble with this case, because these citizenship applications struck me as actually quite remote, too. I can appreciate that, Your Honor, but the recordings are very good in terms of the evidence. Alan Tesh was asked, who is one of the Associate Attorneys, was asked or directed by the defendant to prepare a fraudulent affidavit. The person in whose name that affidavit was testified that he lived in Iraq at the time. There was no such thing as the Chaudian Federation, which is the letterhead on which this affidavit was placed. There was an envelope that was introduced at trial that showed that it was mailed after that point to the defendant to facilitate her renewed asylum application. We have preparation meetings between her and Alan Jacob right before she was about to go into her immigration court hearing. All of those are overt acts, and it shows the defendant was cooperating with his Associate Attorneys to facilitate this broader conspiracy that wasn't limited to the individual client. It is, it's what about prejudice from all of this evidence that's so far outside the statute? I take it the government just didn't know this was happening or something? I don't know why it was seemingly a rather stale prosecution. I don't think the record reflects why. There was a lengthy investigation that's discussed with the district court at various points, including the use of cooperators over a period of time. The fact of the matter is that the trial evidence showed a pattern that remained consistent for many, many years. But this looks like a tiny percentage of his clients, if he was serving thousands of people. And that is certainly not something that the jury heard. The defense attorney cites that. That's not from the trial record. There was litigation before trial about whether the defense could introduce evidence of all of his asylum applications, including ones that he said were not fraudulent. The district court properly rejected that argument, holding that just because he had lawful acts doesn't mean that these applications were unlawful. There is a summary chart introduced at trial, which is in the record as an attachment to docket number 267. I think it's 267-14. It outlines all of the overt acts in this case by client, excluding the cooperator Fado Rasho. And it's helpful insofar as you'll see that the only year between 2000 and 2011 in which there was not an overt act was 2007. That includes the applications for permanent residency and for citizenship, but it was a conspiracy that was having a lot of actions, even if the asylum applications were clustered in time. Some of the reason for that is just because of the long-ranging nature of the conspiracy, because it lasted for so long and only 10 clients testified, there were clusters in time. Some of the clients knew each other, were family members, referred each other to the defendant, and so that happened closer in time than in some cases it might, but it didn't indicate that there was any withdrawal from the conspiracy. Same procedures were followed, especially with respect to the translators in each of these cases, indicating that there was at least an implicit agreement to cooperate beyond that individual case. You know, in the brief, you talk about the defendant conspiring with, you know, the associate attorneys, but you also state that Alan Takish reportedly told the defendant about Benjamin's false translations during the asylum interviews, but that the defendant nevertheless continued to use Benjamin. Doesn't that indicate that Takish was not part of the conspiracy? Did, you know, did the evidence show that Alan Jacob or any other associate attorney was involved in the conspiracy, and for how long were they involved? Alan Jacob certainly was involved in the conspiracy. He is recorded meeting with Rafida Jabouk-Cordova in preparation for her asylum hearing. Their recorded conversations include them laughing about what happened at the 2005 or so, approximately 2005 immigration hearing, where it had turned out that the defendant submitted both her real and her fake first certificate from Iraq. One had the real name, one had the fake name, and Alan Jacob, you know, makes a comment like, oh, that was really unlucky, which makes it very clear that he was well aware that this was not a truthful application, and he was helping facilitate that as an associate of the defendant. Alan Tesh, who testified at trial, I would say was a more hesitant participant in the conspiracy, but he did very clearly know about the conspiracy and take acts to further it. So, for example, he testified that he represented the defendant's clients in asylum interviews. I think he talks about at least six occasions where he's in the asylum interview with the defendant's clients, he speaks both Arabic and English, he's following Benjamin's translations, and he identified mistranslations. He reported them to the defendant, he didn't do anything to report them to, for example, the immigration court or the asylum officer, he reported them to the defendant, and then he proceeded to continue to work for the defendant, including going to the next asylum interview where this happened. Going to the one after that, going to the one after that, each without telling the asylum officer that there was being information mistranslated to be consistent with the false asylum stories. Although the defense is right that he didn't come out and say, I was a gung-ho participant in this conspiracy, he did have immunity from the government for that purpose, and the testimony, the substance of it makes very clear that that is, in essence, facilitating and agreeing to be part of the conspiracy, even if hesitantly. If there are no further questions, the government asks the court affirm the defendant's conviction. Thank you. All right, thank you. Mr. Nash. May I ask the court how much time? Five minutes. First of all, the question about the affidavit, Teck has said that he reported what Ms. Cordova told him, that the defendant was dismissive and preoccupied and said he'd take care of it, and nothing ever happened with the affidavit. He reported it to the defendant, right? Yes, and it was never submitted. And all the affidavit said was that the individual knew when the person entered the United States, not anything else. Second of all, the Jacob conversations, again, nothing comes of them. There's no hearing. There's nothing. They're laughing, as Ms. Kostanek said, but nothing more. That's not an overt act in furtherance of the conspiracy. And those three things are the only thing other than the citizenship applications and the albacore application, which the jury and the judge and the district court found not to be untruthful. Well, it's not like you get a gold star that it is truthful. It's just not enough for a conviction. But that doesn't mean it can't be part of an overt act. Well, you certainly would have to stretch it. And in this case, Your Honor's observation that this case was stale, that's absolutely true. And what happens with stale evidence or stale cases is we get bad facts. These are bad facts. This is a bad conviction. Your Honor, Judge Easterbrook, you asked me about the Santiago proffer, and I might be asking here for another rebuke. But this is the government talking about their evidence. That's the only point. They're telling court what their evidence will show, multiple conspiracies. And that's what we're saying occurred here, exactly what the government said. And then when they change their mind and say, oh, no, it's a single conspiracy. It's because of, quote, unquote, the inclusion of the second interpreter, Yousef, who didn't go to trial. So when the government says our conspiracy analysis changes when he's the only defendant on trial, that's the case here. And they say that it's multiple conspiracy. I didn't make that up. That's what they said. And in response to the motion for a directed verdict, they said the clients don't know what any common purpose is. They can't be co-conspirators. Well, that's not responsive to what Judge Easterbrook was pointing out. The district court doesn't seem to have been looking at the clients. It was looking at the office. That's several individual people. They can conspire with each other. It's Jacob, Takish, and I believe that's all. Well, it's Jacob, Takish. And you've got the first, the one interpreter, then the other interpreter who are manipulating what they've been, what they're hearing so that the story stays straight. The interpreter, the reason you have an interpreter is because the immigration judge probably doesn't speak the language. So you need somebody with integrity to convey what's being said. But none of Yousef's acts are within the statute of limitations. The only one that is, is the two translations by Benjamin and Takish. And why aren't they overt acts within the statute? But in those cases, they aren't enough to bring it within the statute. Are we going to say that one overt act? I know that that's the law. But in a stale prosecution, where the government says it's multiple conspiracies, where it relies on the citizenship applications, which clearly don't belong. There are no facts supporting it. The district court and the government say that they weren't co-conspirators. How can the government say and argue in this court that those are overt acts that bring within the conspiracy? And remember, we've also asked here that one of the rulings the court can do is give us a new trial. Okay, thank you very much. Thanks to both counsel. We'll take the case under advisement.